**FILED IN CHAMBERS**
U.S.D.C. - Atlanta

**MAR 3 0 2009**

James N. Hatten, Clerk
By: _____
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JO ANN JOHNSON, JUDITH
PAISLEY, GAIL TEREN, BERNADINE
UPSHAW, MIRACA JONES, AND
CYNTHIA BRINSON

            Plaintiffs

v.                                    CIVIL ACTION NO.
                                      1:06-CV-2430-ODE

WELLPOINT, INC., THE WELLPOINT
COMPANIES, INC., UNICARE LIFE
& HEALTH INSURANCE COMPANY,
AND WELLPOINT HEALTH NETWORKS,
INC.

            Defendants

_____

                        ORDER

     This Fair Labor Standards Act ("FLSA") case is before the
Court on Plaintiffs' motion for partial summary judgment [Doc.
94], Defendants' motion for summary judgment [Doc. 120], and
Plaintiffs' motion for permission to respond to Defendants'
notice of objections to Plaintiffs' statement of material facts.
[Doc. 172].  Both parties have filed responses in opposition to
the opposing party's motion for summary judgment, and both
parties have filed reply briefs. [Docs. 150, 148, 168, 169].

     For the reasons stated below, Plaintiffs' motion for
partial summary judgment is DENIED. [Doc. 94].  Defendants'
motion for summary judgment is DENIED IN PART and GRANTED IN
PART. [Doc. 120].  Plaintiffs' motion for permission to respond
to Defendants' notice of objections to Plaintiffs' statement of
material facts is GRANTED.  [Doc. 172].

II.  Procedural and Factual Background

  A.  Factual Background[1]

The vast majority of facts in this case are disputed by the parties. Defendants WellPoint, Inc., The WellPoint Companies, Inc., Unicare Life & Health Insurance Company ("Unicare"), and WellPoint Health Networks, Inc. (collectively, "WellPoint" or "Defendants") have filed a response to Plaintiffs' statement of material facts that is nearly 800 pages long [Docs. 152-167], as well as a notice of objections to Plaintiffs' statement of material facts, arguing that Plaintiffs' statement does not comply with several formatting requirements in the Northern District of Georgia's Local Rules because they are not sufficiently concise or separately numbered in the proper way, that the facts are not material, that they contain argumentative language, are supported by inadmissible hearsay, and that Plaintiffs have attempted to "spin" the facts in their favor. [Doc. 151]. Defendants also argue that Plaintiffs' reliance on depositions taken of the three plaintiffs in a prior case

---

[1]Both parties have cited several depositions taken in the case of Morrow v. Unicare Life & Health Insurance Co., No. 1:04-CV-1774-ODE, which was brought by several nurse case managers against WellPoint for violation of the overtime provisions of the FLSA. Those depositions are as follows: Sherry Call [Doc. 106], Lisa Welker-Finney [Doc. 107], Sherry Scott [Doc. 108], Lisa Harris [Doc. 109], Donna Giordano [Doc. 110], Michael L. Watson [Doc. 111], Patricia L. Capezzera (December 23, 2005) ("Capezzera Dep. I") [Doc. 112], Patricia Capezzera (December 20, 2005) ("Capezzera Dep. II") [Doc. 113], Robert Friedman ("Friedman Dep. I") [Doc. 114], Jean Piercy ("Piercy Dep. I") [Doc. 115], Glynis Wampler [Doc. 116], Iris E. Bachenheimer [Doc. 117], and Ronald Morrow [Doc. 118].

brought against WellPoint, <u>Morrow v. UniCare Life & Health Ins. Co.</u>, No. 04-1774-ODE, is improper because the probative value of such evidence is outweighed by the risk of confusion of the issues in that case with the issues in this case, given that the plaintiffs in the <u>Morrow</u> case, Ronald Morrow, Iris Bachenheimer, and Patricia Capezzera, held different job titles from some of Plaintiffs in this case. [Doc. 151, at 11]. Plaintiffs filed a motion requesting permission to respond to Defendants' objections, along with a response to each of Defendants' arguments. [Doc. 172].

The Court has read and taken into consideration Defendants' objections and Plaintiffs' response to those objections as to Plaintiffs' statement of facts.[2] A review of both parties' statements of facts and the opposing responses reveals that a large number of facts in this case are in dispute. For that reason, the Court has reviewed the record and has taken the following facts primarily from its own review of the witness testimony and other admissible evidence cited by the parties in their briefs.[3]

---

[2] Plaintiffs' motion requesting permission to respond to Defendants' notice of objections is therefore GRANTED. [Doc. 172].

[3] The Court finds that because Plaintiffs and Defendants disagree to such a large extent as to the discretion and judgment that Plaintiffs exercised in their day-to-day jobs, and because the Court's analysis of whether Plaintiffs fall within the exemptions under the FLSA necessarily depends on an analysis on the job duties of the Plaintiffs in this case, the deposition testimony of the plaintiffs in <u>Morrow</u> is largely immaterial to the resolution of the immediate dispute.

WellPoint sells insurance products, primarily employee benefits, to employers and other policyholders, and also sells managed care and administrative services to self-funded customers.[4] WellPoint employs Medical Management Nurses (MMNs) and Nurse Case Managers (NCMs) to assist in the management of

---

[4] WellPoint states in its brief that "Although WellPoint's main 'product' is selling health insurance, Plaintiffs were responsible for administering health-insurance benefits for WellPoint's policyholders and members patients [sic]." WellPoint, Inc.'s 2008 Annual Report contains the following description of its business:

> We offer a broad spectrum of network-based managed care plans to the large and small employer, individual, Medicaid and senior markets...In addition, we provide a broad array of managed care services to self-funded customers, including claims processing, underwriting, stop loss insurance, actuarial services, provider network access, medical cost management and other administrative services. We also provide an array of specialty and other products and services including life and disability insurance benefits, pharmacy benefit management, or PBM, specialty pharmacy, dental, vision, behavioral health benefit services, long-term care insurance and flexible spending accounts.

> For our insured products, we charge a premium and assume all or a portion of the health care risk. Under self-funded and partially insured products, we charge a fee for services, and the employer or plan sponsor reimburses us for all or most of the health care costs. Approximately 93% of our 2007 operating revenue was derived from premium income, while approximately 7% was derived from administrative fees and other revenues.

WellPoint 2008 Annual Report (Form 10-K), http://idea.sec.gov/Archives/edgar/data/1156039/000119312508035367/d10k.htm#tx71205_1.

4

health care coverage provided to patients covered under WellPoint's insurance products.

Two of the Plaintiffs, Judith Paisley ("Paisley") and Gail Teren ("Teren"), were employed by WellPoint as MMNs. Paisley worked as a Medical Management Nurse from December 9, 1991 through March 4, 2005. Paisley worked for Cost Care, which was later acquired by UniCare, in its Vinings, Georgia office. [Paisley Dep. I, Doc. 123, at 35-37; Pl.'s Ex. 6].

Teren was employed as a Medical Management Nurse I, and then a Medical Management Nurse II, from December 10, 1990 to April 21, 2005.[5] [Teren Dep., Doc. 130, at 28-29; Pl.'s Ex. 3]. Teren worked in the Vinings, Georgia office throughout her employment. [Teren Dep., Doc. 130, at 31]. Both Paisley and Teren are registered nurses ("RNs") with five years of clinical

---

[5]Teren testified that the position of MMN I is also known as a "utilization and review nurse". [Teren Dep., Doc. 130, at 28]. However, WellPoint's Compensation Manager, Robert Friedman, testified that a utilization review nurse and an MMN are separate jobs with separate job descriptions. [Friedman Dep. II, Doc. 97, at 8-9]. Jean Piercy, who testified that she supervised nurses in WellPoint's Vinings, Georgia office from sometime in the spring of 2003 through the fall of 2003 [Piercy Dep. II, Doc. 100, at 12-13, 116], testified that MMNs follow a case throughout its entire course, whereas utilization nurses only review single procedures at a time. [Piercy Dep. II, Doc. 100, at 8]. She explained that sometimes people might refer to MMNs as "UR" nurses because utilization review was one component of the job of an MMN. [Piercy Dep. II, Doc. 100, at 9].

Teren also testified that she was promoted to the MMN II position, but Plaintiffs claim WellPoint never changed her position. Whether Teren was ever officially moved into the MMN II position is immaterial to the dispute at hand.

experience. [Paisley Dep. I, Doc. 123, at 16; Def.'s Ex. G, Doc. 120-21, at 21-22; Teren Dep., Doc. 130, at 21, 24].

The remaining Plaintiffs were employed as Nurse Case Managers (NCMs) at WellPoint. Plaintiff Cynthia Brinson ("Brinson") was employed as a Senior Nurse Case Manager from approximately July 1997 until April 21, 2005. [Brinson Dep. II, Doc. 129, at 29; Pl.'s Ex. 5].[6] From 1998 through April 2005, Brinson worked in the Capital City Plaza office in Atlanta, Georgia. [Brinson Dep. II, Doc. 129, at 32]. Plaintiff Jo Ann Johnson ("Johnson") was a Nurse Case Manager from approximately September 30, 2002 through September 23, 2005. [Pl.'s Ex. 8]. Johnson worked first in WellPoint's Vinings, Atlanta Georgia office and then was transferred to the Buckhead, Atlanta, Georgia office, where she worked from 2003 through the end of her employment. [Johnson Dep. I, Doc. 122, at 39, 56]. Plaintiff Miraca Jones ("Jones") was a Nurse Case Manager from November 18, 2002 to November 18, 2005, and later was rehired by Wellpoint in September 2007 as a Senior Nurse Case Manager. [Pl.'s Ex. 7]. Jones worked for the UniCare office in Vinings, Georgia from 2002 up until the last eight months of her employment and in the Capital City Plaza office in Atlanta, Georgia thereafter. [Jones Dep., Doc. 131, at 38-39]. Plaintiff Bernadine Upshaw ("Upshaw") was a Nurse Case Manager from November 11, 2002 until November 4, 2005. [Pl.'s Ex. 4]. Upshaw worked for the UniCare office in Vinings, Georgia for the first

---

[6]Brinson testified that she was employed outside of WellPoint for one month in 2003, and then came back to WellPoint. [Brinson Dep. II, Doc. 129, at 42].

two years of her employment and in the Capital City Plaza office in Atlanta, Georgia thereafter. [Upshaw Dep. I, Doc. 124, at 46].

Each of the four Plaintiffs employed as NCMs also hold RN degrees, and each had at least five years of clinical experience, with the exception of Jones, who appears to have had three years of clinical experience when she worked at WellPoint.[7] [Brinson Dep. II, Doc. 129, at 21-22; Jones Dep., Doc. 131, at 19; Doc. 149, at 12; Upshaw Dep. I, Doc. 124, at 19, 21; Johnson Dep. I, Doc. 122, at 121, 180]. Brinson and Johnson are also certified case managers. [Brinson Dep. II, Doc. 129, at 20-21; Johnson Dep. I, Doc. 122, at 20, 23]. Brinson has a masters degree in health care administration. [Brinson Dep. II, Doc. 129, at 20-21].

It is undisputed that sometime around early 2003, WellPoint announced that the Plaintiffs would be required to work extra hours in order to take care of a backlog of work, and that each of the Plaintiffs regularly worked over 40 hours per week beginning at that time in order to complete their workload. [Paisley Dep. I, Doc. 123, at 65; Piercy Dep. I, Doc. 115, at 83-84].

---

[7]Jones' resume reflects only three years of clinical experience [see Def.'s Exs. C, D, Doc. 120-21, at 9-13]; however, Plaintiffs admit in their response to Defendant's statement of material facts that Jones has five years of clinical experience. [Doc. 149, at 12].

## 1. Job Descriptions and Requirements

On November 2, 2001, WellPoint published job descriptions covering both the MMN and NCM positions for the relevant time period. [Def.'s Exs. 4, 9]. However, Plaintiffs contend that these job descriptions are not an accurate picture of what they actually did. The job description for MMN I contains a list of the following tasks:

- Conducts pre-certification, concurrent and retrospective reviews.
- Guides the member into utilization of contracted physicians, facilities and healthcare service providers.
- Early identification of discharge planning needs.
- Refers treatment plans/Plan of Care to Peer Clinical Reviewers (PCR) as required.
- Works in partnership with hospitals and healthcare service providers.
- Performs other related duties as required.

[Def.'s Ex. 9]. The job description tasks for MMN II are identical, with the exception that MMN IIs "may handle complex cases." [Def.'s Ex. 9].

The job description also contains a section entitled "core content," which lists the tasks above as well as a few other, more general task descriptions, such as "[f]acilitates communication among members,[8] the healthcare delivery system, and WellPoint," and "[e]nsures member access to medically necessary quality care while satisfying requirements of member contracts." [Def.'s Ex. 9]. The job description also contains a section entitled "Job Specific Technical Skills," including "[s]trong organizational, problem solving and decisionmaking

---

[8]Patients are referred to by WellPoint as "members." [See Piercy Dep. II, Doc. 100, at 101].

skills," and the "[a]bility to make sound decisions based on clinical judgment, established clinical guidelines and individual circumstances." [Def.'s Ex. 9].

The job description specifies that the education and experience requirements for an MMN are an associate's degree in nursing or the equivalent, a current unrestricted RN license in applicable states, two years of acute clinical experience,[9] "or any combination of education/experience, which would provide an equivalent background." [Def.'s Ex. 9]. The position of MMN II also requires one year of equivalent medical management experience. [Def.'s Ex. 9].

The job description for NCMs contains the following tasks:

- Conducts assessments to identify individual needs that will serve as the basis for a comprehensive case management plan.
- Prepares a specific case management plan to address objectives and goals as identified during assessment.
- Implements care plan as appropriate.
- Links members and providers to facilities, community agencies and provider/network resources.
- Participates in department Grand Rounds / Case Conferences meetings.
- Performs other duties as required.

[Def.'s Ex. 4]. The job tasks for Senior NCMs is identical, with the exception that they also assist with the development of care management policies and procedures. [Def.'s Ex. 4].

The job description for NCMs also contains a section entitled "core content," which lists the tasks above as well as a few other tasks, including "[n]egotiates rates of reimbursement," "[i]nterfaces with Medical Directors and

---

[9]The job description also provides that "[a]n advanced degree or certification may be required for specific programs and/or clients."

Physician Advisors on development of case management treatment plans," and "[a]ssists in problem solving providers, claims or service issues." [Def.'s Ex. 4]. The job description also contains a section entitled "Job Specific Technical Skills," including "[k]nowledge of case management assessment techniques," "[s]trong organizational, problem solving and decision making skills," and "negotiation and facilitation skills." [Def.'s Ex. 4].

According to the job description, the required education and experience to become an NCM consists of an associate's degree in nursing or the equivalent, a current unrestricted RN license in applicable states, three years of clinical experience in a hospital setting, and a preferred minimum of one year home health or discharge planning experience, "or any combination of education/experience, which would provide an equivalent background." [Def.'s Ex. 4]. The credentials required for a Senior NCM are identical, with the exception that five years of clinical experience, including previous case management experience, is required, and an understanding of the health insurance and benefits industry. [Def.'s Ex. 4].

Robert Friedman, WellPoint's Compensation Manager, drafted both of the job descriptions published on November 2, 2001 by WellPoint with the assistance of Jean Piercy, Director of Medical Management Operations, who supervises MMNs and NCMS. [Friedman Dep. II, Doc. 97, at 14-15; Piercy Dep. II, Doc. 100, at 7, 10]. He testified that he based the job descriptions on the reports he received from a committee of managers nationwide who oversaw nurses for WellPoint. [Friedman Dep. II, Doc. 97, at

10-11]. Friedman testified that this committee provided him with the information about what the jobs entailed and Friedman put that information into the job descriptions. [Friedman Dep. II, Doc. 97, at 10-11]. Friedman also testified that he did not speak to any individual NCMs or MMNs when drafting the job descriptions. [Friedman Dep. II, Doc. 97, at 11, 36-37].

2. Milliman Guidelines

In order to carry out their day-to-day job duties, MMNs and NCMs used a computer system known as "WMDS,"[10] which contains guidelines for patient care embedded within the system. These guidelines are known as the Milliman Care Guidelines (the "Milliman Guidelines" or the "Guidelines"). [Jones Dep., Doc. 131, at 42, 48, 63; Piercy Dep. II, Doc. 100, at 29; Paisley Dep. I, Doc. 123, at 41].[11] The Milliman Guidelines are compiled by clinical experts, provide a guideline of how a patient should progress under ideal circumstances, and give criteria for medical necessity. [Piercy Dep. I, Doc. 115, at 94-95; Piercy Dep. II, Doc. 100, at 18-19; Allen Dep.,[12] Doc. 102,

---

[10]"WMDS" stands for WellPoint Medical Decision Support. Morrow v. UniCare Life & Health Ins. Co., No. 04-1774-ODE, slip op. (N.D. Ga. Sept. 1, 2006).

[11]Jones testified that the WMDS system was implemented within a year of her starting. Prior to that time, she performed the same processes, but using paper print-outs of Milliman and "InterQual" guidelines in booklet form. [Jones Dep., Doc. 131, at 49].

[12]Donna Allen (Advisor, Technical Business Systems for WellPoint), testified as a Rule 30(b)(6) witness for WellPoint. [Doc. 102, at 6].

at 28-29]. A patient may, however, progress at a different rate than what is indicated in the Milliman Guidelines. [Piercy Dep. II, Doc. 100, at 18-19].

The Milliman Guidelines contain the following disclaimer:

> The appropriate use of these Guidelines requires professional medical judgment and may require adaptation to consider local practice patterns. Professional medical judgment is required in all phases of the health care delivery and management process that should include consideration of the individual circumstances of any particular patient. These Guidelines are not intended as a substitute for this important professional judgment.

> Use of the Guidelines as a basis for denying authorization for treatment without proper consideration of the unique characteristics of each patient or as a basis for denying payment for treatment received is an inappropriate use of the Guidelines.

[Morrow Dep., Ex. 39, Doc. 174-3].

Plaintiffs were trained in the use of the Milliman Guidelines and the WMDS system when they began work at WellPoint. [Teren Dep., Doc. 130, at 87-88; Upshaw Dep. I, Doc. 124, at 67-68, 121].

### 3. Job Responsibilities of Medical Management Nurses

In their day-to-day job duties, Plaintiffs working as MMNs used the Guidelines and WMDS as tools to conduct what are known as "precertification reviews," "concurrent reviews," and "retrospective reviews." [Teren Dep., Doc. 130, at 52, 59, 71]. Precertification reviews occur prior to medical services being initiated with a patient. [Piercy Dep. II, Doc. 100, at 39]. These reviews required the MMNs to receive clinical data from a provider's office over the telephone, which they would type into their computer system. [Teren Dep., Doc. 130, at 59]. Teren testified that the questions she asked providers for

12

precertification were cued by a list of topics in WMDS, but the questions themselves were not worded on the computer. [Teren Dep., Doc. 130, at 69-70]. Teren testified that she would ask the provider for a diagnosis and an explanation of the medical procedure. [Teren Dep., Doc. 130, at 66]. Once the clinical information was collected, the MMN would then electronically send the information to a doctor at WellPoint for review. [Teren Dep., Doc. 130, at 69]. Teren testified she spent about 37% of her time on precertification reviews. [Teren Dep., Doc. 130, at 61].

MMNs would also conduct concurrent reviews while a patient was being treated. [Piercy Dep. II, Doc. 100, at 42-43]. For concurrent reviews, MMNs would speak with a nurse at the provider's location or receive faxes from the provider containing the clinical data on a patient. [Paisley Dep. I, Doc. 123, at 43, 45-47]. The MMN would then input the information she received into WMDS. [Teren Dep., Doc. 130, at 71].[13] Teren testified that she would always ask the caller about the discharge plans for the patient, but otherwise did not prompt the provider with questions and did not worry about whether the information that she received was complete or

---

[13]Paisley testified she would enter the information into "blanks" on her computer system. [Paisley Dep. I, Doc. 123, at 53-54, 79]. It is unclear whether the information was entered in a narrative format or whether the computer contained a preformatted area for information.

correct.[14]   [Teren Dep., Doc. 130, at 72-73].  Plaintiffs
testified that once the MMN input the information into WMDS, if
the computer system indicated that the treatment met the
Milliman Guidelines, then the computer system would indicate
that a certain number of days in the hospital could be approved
for the procedure and the patient. [Teren Dep., Doc. 130, at 60-
61, 76-78].  The MMN could then inform the provider that the
treatment was approved. [Paisley Dep.,  Doc. 123, at 80].  If
the clinical information did not meet the Milliman Guidelines,
then the MMN would submit the information to a WellPoint
physician for review.[15]  [Teren Dep., Doc. 130, at 73-74; Paisley

---

[14]It is unclear whether Teren always asked about discharge
plans due to her nursing training, or whether she was prompted by
the computer system to ask about discharge plans.  She testified
that she "would be proactive" and would always ask about the
discharge plan at the beginning of every conversation, and stated
that "In nursing school we're told you plan discharge on the day
of admission." [Teren Dep., Doc. 130, at 96].

[15]Paisley testified that she did not have conversations with
physicians regarding these referrals for review.  [Paisley Dep. I,
 Doc. 123, at 82-83].  MMNs could make referrals to WellPoint
physicians through the computer system; the case would go into the
physician's "queue," where the physician could pull it up on his
computer. [Paisley Dep. I,  Doc. 123, at 83].  If the request was
urgent, Paisley testified she could give the physician a case
number and the physician could look up the case and review it
immediately. [Paisley Dep. I,  Doc. 123, at 83].
     Sometimes if clinical information was missing from the
record, an initial denial would be sent to a provider to inform
the provider of the missing information.  This was done because
certain accreditation standards required WellPoint to provide an
approval or denial on coverage within 72 hours. [Paisley Dep. I,
Doc. 123, at 84].  Later, once the clinical information was
received from the provider, the MMN would enter it into the
computer, which would indicate whether it met the Guidelines.

14

I, at 80]. The extent to which the MMN herself made a decision that a treatment was approved based on the Guidelines, or whether the MMN completely relied on WMDS for such a determination, is vigorously disputed by the parties. Teren testified that she did not make any decisions to grant such approvals: "I only approved things as per guidelines. I didn't personally approve things. I only followed Milliman guidelines on days in the hospital. I did not make any decisions on approving anything." [Teren Dep., Doc. 130, at 76]. Paisley also testified that she did not make any independent determination as to whether a treatment or service would be approved under the Milliman Guidelines: "The computer would determine whether it [sic] approved or not approved." [Paisley Dep., Doc. 123, at 79, 81.] Paisley testified that she was not authorized to override or disagree with any determination made by the computer that a service or procedure was not approved; only a physician could override the computer's determination that something was not approved. [Paisley Dep. I, Doc. 123, at 79-81]. Teren testified that she spent about 37% of her time conducting concurrent reviews. [Teren Dep., Doc. 130, at 61].

MMNs would also conduct "retrospective reviews" of a patient's records after the patient had been admitted to a hospital or medical treatment had been completed. [Teren Dep., Doc. 130, at 52; Paisley I, Doc. 123, at 53-54]. Retrospective reviews entailed reviewing the documentation in a patient's records and summarizing the data into a narrative form using

---

[Paisley Dep. I, Doc. 123, at 84].

word processing software. [Teren Dep., Doc. 130, at 53; Paisley I, at 46, 54]. Teren testified that she would use the Milliman Guidelines to determine what information in a patient's records should be included in the summary, such as abnormal vital signs, the patient's progress with treatment, and changes in medication. [Teren Dep., Doc. 130, at 53]. Teren stated that she did not make any decisions regarding how to complete the retrospective review summaries. [Teren Dep., Doc. 130, at 56-57]. The information collected by the MMN would then be reviewed against the Milliman Guidelines. [Paisley Dep. I, Doc. 123, at 46]. If the information met the Milliman Guidelines, the nurse would inform the provider. [Paisley Dep. I, Doc. 123, at 44, 53-54]. If the treatment or service did not meet the Milliman Guidelines, the MMN would send the information to physicians at WellPoint for review. [Teren Dep., Doc. 130, at 53-54; Paisley Dep. I, Doc. 123, at 44, 46, 53-54]. Teren testified that she dedicated about 25% of her time doing retrospective reviews. [Teren Dep., Doc. 130, at 54].

MMNs also made referrals of cases to NCMs for case management if a case appeared to have ongoing or complex issues. [Teren Dep., Doc. 130, at 88; Piercy, at 8]. Teren testified that to determine whether to send the case to case management, she would look at whether a patient was in the hospital for a time that exceeded the Milliman Guidelines and whether a patient had complications during treatment, and, if so, she would refer the case to case management. [Teren Dep., Doc. 130, at 89]. However, Teren testified that she did not make the final

16

decision as to whether or not the case would be accepted into case management. [Teren Dep., Doc. 130, at 89-90].

Teren also testified that she developed a written protocol that was later included in WellPoint's policy manual as to how medical files would be initially handled by medical assistants when they were received for retrospective review, how review files would be created in the computer system, and how files would be sent to MMNs for review. [Teren Dep., Doc. 130, at 106-107].

Both Teren and Paisley testified that they were aware that their work was audited by their supervisors. [Teren Dep., Doc. 130, at 98-99; Paisley I, at 77]. While Teren testified that she interacted with her supervisor on a daily basis, both Teren's and Paisley's testimony indicates that they operated without much guidance from their supervisors. [Teren Dep., Doc. 130, at 98; Paisley Dep. I, Doc. 123, at 57 (testifying that her supervisors were available for questions, performed evaluations, and gave her company updates)].

4. Job Responsibilities of Nurse Case Managers

Whether the NCMs had the final decision-making authority as to whether a case should be in case management is in dispute by the parties. According to the Plaintiffs who were NCMs at WellPoint, if a case was forwarded to them for case management, they had no authority to refuse the case or determine that it should not be in case management. [Jones Dep., Doc. 131, at 63; Upshaw Dep. I, Doc. 124, at 112-14; Johnson Dep. I, Doc. 122, at 140]. However, Defendants presented testimony from Piercy that Plaintiffs did in fact have the authority to reject a case sent

for case management, and that NCMs made the ultimate decision as to whether a case would be accepted into case management without oversight from a supervisor.[16] [See Piercy Dep. I, Doc. 115, at 116-19, 124, 130-31 174-75; see also Bachenheimer Dep., Doc. 117, at 69].

Once a case was referred for case management, the NCM would review the case file and begin to gather clinical information about the patient from providers, most often nurses or staff at doctor's offices and hospitals, by telephone and by facsimile, which the NCM would then enter into WMDS. [Jones Dep., Doc. 131, at 62; Brinson Dep. II, Doc. 129, at 49-50, 53-54; Johnson Dep. I, Doc. 122, at 57-59, 69, 74, 151; Upshaw I, at 79, 81]. Jones testified that she spent about 15%-20% of her time gathering clinical information. [Jones Dep., Doc. 131, at 82].

According to Plaintiffs, WMDS would prompt the NCMs with specific questions to ask regarding clinical information on the patient, such as the diagnosis, clinical history, whether the patient had complications or comorbidities, the date of admission of the patient, and the patient's current clinical status. [Brinson Dep. II, Doc. 129, at 57; Jones Dep., Doc. 131, at 46; Johnson Dep. I, Doc. 122, at 74-75, 129]. It is unclear how much discretion the NCMs had to determine how to input the information into the computer. Brinson testified that the computer would provide her with a series of questions as

---

[16]Piercy testified that an NCM might reject a case, for instance, because there is nothing the NCM can do in case management to help the patient, or the patient could be known to be completely noncompliant. [Piercy Dep. I, Doc. 115, at 125].

well as a large field she could type information into. [Brinson Dep. II, Doc. 129, at 57]. Upshaw testified that there was no place in the computer system for her to make notes of her own to explain what she was doing when she entered clinical information. [Upshaw Dep. I, Doc. 124, at 118-19].[17] Johnson testified that she never "independently" asked any questions of the providers during her entire time at WellPoint, because she only asked the questions that the computer told her to ask. [Johnson Dep. I, Doc. 122, at 75, 129]. Johnson also testified that she did not review the medical records of the patients; she only received the clinical information called in by the providers. [Johnson Dep. I, Doc. 122, at 129-30]. Jones testified that she spent 15%-25% of her time reviewing information, and 60% of her time inputting information into the computer. [Jones Dep., Doc. 131, at 83]. If certain clinical information requested by the computer was missing, the NCM would call the provider or facility for that information. [Brinson

---

[17] Jones testified that it was part of her job to complete "assessments." [Jones Dep., Doc. 131, at 185; Def. Ex. 4]. Jones explained that an assessment involves speaking with "all clinical parties involved" to collect all clinical information, as well as speaking with the member, and entering that information into the computer system and the Milliman Guidelines. [Jones Dep., Doc. 131, at 185]. Piercy testified that "assessments" were conducted after the NCM gathered information on the patient's clinical, social, and economic situation. [Piercy Dep. I, Doc. 115, at 26]. Upshaw testified that she did not conduct assessments. [Upshaw Dep. I, Doc. 124, at 132, 135]. Plaintiffs contend that "assessments," as they were performed by Plaintiffs, did not contain any independent judgment on the part of Plaintiffs because they were merely gathering information and inputting it into their computer system. [Doc. 168, at 1-2.]

Dep. II, Doc. 129, at 55; see Johnson Dep. I, Doc. 122, at 79].
It is unclear whether the NCM would make independent
determinations that clinical information was missing other than
being unable to answer questions in WMDS.

Once the clinical information was entered into the
computer, WMDS would generate a care plan for the patient based
on the information entered by the NCM, which might include a
recommended length of stay in the hospital. [Jones Dep., Doc.
131, at 43, 45, 47; Upshaw I, at 101-102, 106; Johnson, at 69].
The NCMs testified that they did not generate the plans
themselves; instead, they claim that WMDS generated the plans
based on the Milliman Guidelines and the information that the
NCMs had entered into the computer. [Upshaw Dep. I, Doc. 124, at
135-36; Brinson Dep. II, Doc. 129, at 72; Johnson Dep. I, Doc.
122, at 60-64, 76, 124-25]. However, the Defendants maintain
that the care plans were required to be customized to fit the
needs of each patient, and this customization necessarily
entailed the NCMs' using their nursing judgment and discretion
to tailor the care plans to each individual patient. [See Piercy
Dep. I, Doc. 115, at 160-61 (accreditation requirements dictate
that care plans must be extremely member specific)]. Piercy
testified that NCMs must build care plans in WMDS starting from
a template which is specific to the patient's condition or
diagnosis, and which then must be customized depending on the
complications in the patient's condition. [Piercy Dep. I, Doc.
115, at 158-61]. The Plaintiffs testified that the care plans
did contain goals that were individualized and based on the
patient's condition. [Upshaw Dep. I, Doc. 124, at 106; Brinson

20

Dep. II, Doc. 129, at 72; see also Piercy Dep. I, Doc. 115, at 159-61].

Once a care plan was generated, it would be stored in WMDS or it could also be printed out. [Jones Dep., Doc. 131, at 48]. Johnson testified that the care plan then would be sent to a WellPoint physician for review; however, Upshaw testified that once a care plan was generated, it was effective without further approvals. [Johnson Dep. I, Doc. 122, at 61-64, 69, 80; Upshaw Dep. I, Doc. 124, at 109-10]. The NCMs also testified that they would then communicate with providers regarding the treatment and benefits that were approved. [Jones Dep., Doc. 131, at 44-45, 53-54; Upshaw Dep. I, Doc. 124, at 137; Brinson Dep. II, Doc. 129, at 59]. Jones testified that she would sometimes also speak with a patient or member of the patient's family. [Jones Dep., Doc. 131, at 44, 53-54]. Upshaw testified that she might communicate to a nurse taking care of the patient whether there was a choice of providers for a patient provided in WMDS. [Upshaw Dep. I, Doc. 124, at 137]. Jones testified that she spent about 20%-25% of her time discussing plans with the provider and the patient and comparing the plan to the clinical information received from providers. [Jones Dep., Doc. 131, at 77, 83].

NCMs were responsible for periodically checking on patients' progress and updating the care plans with new information from providers. [Brinson Dep. II, Doc. 129, at 73-74, 82, 88; Johnson Dep. I, Doc. 122, at 57-58; Upshaw Dep. I, Doc. 124, at 85-86, 105, 123; Jones Dep., Doc. 131, at 117 (Jones testified that she would call a provider to confirm

discharge dates)]. Any updated information received from providers may result in a change in the care plan, depending on the rate at which the patient was progressing. [Brinson Dep. II, Doc. 129, at 74; Upshaw Dep. I, Doc. 124, at 103]. Brinson testified, for instance, that she would update plans with new information by typing a summary of her notes into WMDS, and she sometimes put "alerts" in that summary, such as an asterisk. [Brinson Dep. II, Doc. 129, at 74-75, 88]. Upshaw testified that if she discovered that a patient had a need that was not being met, she might call the patient's physician to see if the doctor would order what the patient needed. [Upshaw Dep. I, Doc. 124, at 80-81, 105-106]. Otherwise, Upshaw testified that she would not monitor patients to find out if they were on track with their care plans. [Upshaw Dep. I, Doc. 124, at 123-24].

It is unclear how much discretion or nursing judgment the NCMs used when they monitored patients and updated care plans, or whether they had authority to change a care plan without further authorization. Piercy testified that part of NCMs' job responsibilities was to "monitor the progress, re-evaluate and change the interventions and care plan as necessary" as well as "to ensure that the right care is being provided in the right place by the right providers." [Piercy Dep. I, Doc. 115, at 28]. Piercy's testimony also indicated that an NCM could deviate from set deadlines in WMDS, so long as the NCMs supported their rationale with documentation. [Piercy Dep. I, Doc. 115, at 75-76]. Jones testified that she could alter deadlines in the care plan with the approval from the medical director, but if she changed them on her own, she would need to document the medical

policy that was the basis for the change. [Jones Dep., Doc. 131, at 183].

According to the other Plaintiffs' testimony, however, if anything in the care plan changed, it had to be sent to a WellPoint physician for review, and they otherwise did not change or revise the care plans. [Brinson Dep. II, Doc. 129, at 96; Upshaw Dep. I, Doc. 124, at 102, 107]. Brinson also testified that the guidelines would dictate how often she must check on the status of a patient or update the care plan. [Brinson Dep. II, Doc. 129, at 102]. Johnson initially testified that as the patient was undergoing treatment she would review the care plan in relation to the information that she received from providers to make sure that the plan was still appropriate and it was being carried out, but that if she received updated information, she would send it to a WellPoint physician for review. [Johnson Dep. I, Doc. 122, at 62-63, 138-39]. Johnson later testified that she never evaluated whether or not a patient was progressing under the care plan, nor did she ever revise the care plan generated by the computer. [Johnson Dep. I, Doc. 122, at 63, 65, 77, 125, 137-139].

Plaintiffs testified that NCMs did, at times, also speak with patients or their families. [Johnson Dep. I, Doc. 122, at 58; Upshaw Dep. I, Doc. 124, at 82-83; Brinson II, doc. 129, at 90]. Johnson, for instance, testified that patients would occasionally call her if they needed "emotional support" or if they had questions as to whether certain services had been approved, and she might also speak with them regarding their decision to be in case management. [Johnson Dep. I, Doc. 122,

23

at 125-28]. Upshaw said she would usually discuss with the patient a choice they had already made about their treatment, but that she never made recommendations to a patient as to their recovery. [Upshaw Dep. I, Doc. 124, at 83, 109].

The NCMs could recommend various community resources to patients depending on their needs and specific situation. [Brinson Dep. II, Doc. 129, at 76-79; Johnson Dep. I, Doc. 122, at 140-41; Piercy Dep. I, Doc. 115, at 33-34]. The NCMs had a list of community resources to which they could refer, and they could determine which community resources would be appropriate depending on the patient's circumstances. [Jones Dep., Doc. 131, at 66-67]. NCMs would then document these referrals in the patient's care plan in WMDS. [Jones Dep., Doc. 131, at 68]. NCMs would sometimes make these recommendations where a patient needed a service or equipment that would not be covered under the patient's plan, and the NCM would follow up with the patient to ensure that their needs had been met. [Jones Dep., Doc. 131, at 71-72]. Jones testified that she collected nonclinical information from patients, such as family history and hobbies, which would be relevant in recommending helpful community resources to the patient. [Jones Dep., Doc. 131, at 73-76].

At times, providers disagreed with the treatment plans approved pursuant to the Guidelines. [Jones Dep., Doc. 131, at 54; Brinson Dep. II, Doc. 129, at 89]. In these situations, Plaintiffs testified that the provider was required to supply additional clinical information, which the NCMs would send to a medical director at WellPoint for review. [Jones Dep., Doc. 131, at 58, 115; Brinson Dep. II, Doc. 129, at 89]. Brinson also

testified that she did not have the discretion to address these disagreements herself or make any recommendations to the medical director as to how to resolve the disagreement. [Brinson Dep. II, Doc. 129, at 89-90]. Brinson did concede during her testimony that if she needed to approach the medical director in order to get an approval for a patient, she might attempt to advocate for the patient "by communicating with the doctor what the clinical picture is and requesting approval to grant more days or more time [in the hospital]." [Brinson Dep. II, Doc. 129, at 107]. Brinson could, at the medical director's direction, communicate the medical director's suggestion that a patient receive a certain type of treatment, but she had no authority to negotiate with the provider herself. [Brinson Dep. II, Doc. 129, at 90].

NCMs also participated in "grand rounds," in which they would present cases to other NCMs, their supervisor, and WellPoint physicians, and where they would receive feedback regarding how to help patients meet their goals in their care plans. [Jones Dep., Doc. 131, at 105-106; Upshaw Dep. I, Doc. 124, at 128-30, 143; Brinson Dep. II, Doc. 129, at 110; Johnson, at 67]. Brinson testified that she was able to give her opinion during grand rounds about whether a pending request for a treatment should be approved or accommodated. [Brinson Dep. II, Doc. 129, at 113].

Brinson and Johnson testified that they also performed "acuity surveys" or "acuity screens" which determine the length of hospital stay that should be approved based on a diagnosis and the patient's needs relative to that diagnosis, and to

25

determine whether a patient was in the appropriate facility to receive the needed care. [Brinson Dep. II, Doc. 129, at 64-65, 67-68, 70; Johnson, at 78; Doc. 153, at 43]. These surveys are conducted by asking hospital staff a series of questions given by the Guidelines. [Brinson Dep. II, Doc. 129, at 65-66]. Brinson testified that WMDS would then determine whether the patient was in the appropriate facility, and whether a continued stay should be approved or denied. [Brinson Dep. II, Doc. 129, at 66-68]. To determine whether the patient is in the appropriate facility, Brinson would review the information she had gathered with a WellPoint physician. [Brinson Dep. II, Doc. 129, at 71]. Typically, this review would take place using both a writeup and a verbal presentation. [Brinson Dep. II, Doc. 129, at 71]. When asked whether she would ever make recommendations to the physician as to whether a patient was in an appropriate facility, Brinson responded that she would have a "discussion" with the medical director regarding whether a patient should be moved or whether the patient was in the appropriate facility. [Brinson Dep. II, Doc. 129, at 71].

NCMs operated under requirements of how quickly they responded to providers and how many cases they handled. [Jones Dep., Doc. 131, at 87; Piercy Dep. I, Doc. 115, at 75-76]. Supervisors would audit cases periodically and would review areas needing improvement in one-on-one sessions with the NCMs.[18] [Jones Dep., Doc. 131, at 90-91, 104; see Def. Ex. 27;

_____

[18]Piercy testified that accrediting organizations provide standard auditing procedures for case managers. [Piercy Dep. I,

Johnson Dep. I, Doc. 122, at 153-55]. Johnson said she never had any direct conversations with any WellPoint physicians about care plans, but she would speak with a supervisor if she had a question regarding a plan, or wanted to know if she was inputting clinical information correctly. [Johnson Dep. I, Doc. 122, at 80-81]. Johnson also testified that there would be occasional meetings with supervisors regarding company updates. [Johnson Dep. I, Doc. 122, at 66].

None of the Plaintiffs other than Jones testified that they negotiated with vendors or physicians. [Brinson Dep. II, Doc. 129, at 96-97; Johnson Dep. I, Doc. 122, at 63, 140; Upshaw Dep. I, Doc. 124, at 131; Teren Dep., Doc. 130, at 85-86, 93; Paisley Dep. I, Doc. 123, at 109]. Jones testified that she did negotiate the price of drugs and equipment from vendors almost every day, and that negotiating was one of her responsibilities, although she did not have the authority to negotiate with providers regarding what type of treatment a patient would be allowed to receive.[19]  [Jones Dep., Doc. 131, at 103, 114-15]. However, Piercy testified that case managers could negotiate with providers when approving services, so long as they did not deny a service without physician review, and she stated that

_____

Doc. 115, at 81].

[19]Jones later testified that she had the authority to negotiate prices with vendors "a little bit, not very much." [Jones Dep., Doc. 131, at 114]. It is unclear whether Jones was referring to the frequency with which she negotiated such prices, or the aggressiveness with which she would negotiate prices.

NCMs could collaborate with the provider on the appropriate level of care. [Piercy Dep. II, Doc. 100, at 97-99].

> 5. Plaintiffs' Use of Discretion, Judgment, and Nursing Expertise

Plaintiffs and Defendants dispute how much discretion Plaintiffs exercised or how much authority they had to make decisions in their work. Defendants and Plaintiffs agree that Plaintiffs had no authority to deny a medical treatment to a patient; only a WellPoint doctor could deny coverage for a medical treatment. [Doc. 153, at 22; see Piercy Dep. I, Doc. 115, at 94 (testifying that it is against regulations for a nurse to make a denial of services; denials must be by a physician reviewer)].

Plaintiffs also contend, however, that they had no authority independently to approve services or treatment other than what the Guidelines told them could be approved. [Upshaw Dep. I, Doc. 124, at 117-18, 128; Teren Dep., Doc. 130, at 151-52; Paisley Dep. I, Doc. 123, at 109-110, 116-17; Jones Dep., Doc. 131, at 114-15; Brinson Dep. II, Doc. 129, at 95-96].

Plaintiffs further contend that they did not use their nursing judgment or training in their jobs, either to analyze the clinical information they received or to make decisions. Upshaw testified that she would not determine what information she would put into the computer for the care plan, but instead, input information that she received from the providers "word for word." [Upshaw Dep. I, Doc. 124, at 108; see also Jones Dep., Doc. 131, at 66, Johnson Dep. I, Doc. 122, at 74-75, 187-88; Paisley Dep. I, Doc. 123, at 80, 82; Upshaw Dep. I, Doc. 124, at

99-100]. Upshaw testified she believed someone who is not an RN could do her job. [Upshaw Dep. I, Doc. 124, at 99, 151]. Teren testified that she believed that someone who was not an RN could perform her job, because most of the job was "data entry." [Teren Dep., Doc. 130, at 145]. Johnson stated that she would sometimes ask questions of the providers "[i]f I needed temperature or maybe a vital sign, blood pressure," but that she would only do so because the system would prompt her to ask that information. [Johnson Dep. I, Doc. 122, at 74]. She believed that someone could do her job even if they did not have a college degree or even a high school degree. [Johnson Dep. I, Doc. 122, at 131]. Brinson testified that "while it was good to have some nursing knowledge, for the most part I felt that it was basically high-level data entry clerk type of a responsibility and sometimes insulted that it wasn't necessarily always appreciated, the nursing knowledge that I do have." [Brinson Dep. II, Doc. 129, at 94].

Some of Plaintiffs' testimony, however, suggests that they may have used their nursing knowledge in carrying out their duties. Jones testified, for instance, that when she conducted retrospective reviews, she was responsible for reviewing all of the medical records of a patient, and that she would determine whether there were factors that would complicate a patient's condition. [Jones Dep., Doc. 131, at 47]. She stated that these complications would be noted in the records, or the facility would notify her explicitly of the complication, but she also testified that she would identify comorbidities in the clinical records of patients, and that she learned what conditions are

cormobidity factors in nursing school. [Jones Dep., Doc. 131, at 46, 52, 185, 187-88]. It is unclear how much of her nursing knowledge Jones used in determining whether a patient had complications that she would need to input into WMDS.

Teren testified that she did not know whether her nursing education and experience helped her to write summaries for retrospective reviews. She stated that she knows how to recognize abnormal signs, but that "most of the time" whether something was abnormal would have already been noted in the record, or it would be common knowledge. [Teren Dep., Doc. 130, at 55, 58-59]. She stated, for instance, that "some of it, you know-I know that-I think all of us know that anything over 98.6 is an abnormal temperature or, you know, just general knowledge like blood pressure over 150 over 90 is going to be high." [Teren Dep., Doc. 130, at 55].

Paisley testified that she thought that the medical knowledge she has as a RN was helpful to recognize the information she was receiving. [Paisley Dep. I, Doc. 123, at 48, 85-86]. She also stated that as for her clinical experience, "I guess it would be helpful but you had to review the information against the guidelines." [Paisley Dep. I, Doc. 123, at 48].

Plaintiffs also conceded that one would at least need to know medical terminology in order to do their jobs. [Upshaw Dep. I, Doc. 124, at 99; Jones Dep., Doc. 131, at 93]. Johnson testified that having some medical knowledge such as knowing what a vital sign means, such as blood pressure, might be needed. [Johnson Dep. I, Doc. 122, at 131-33].

30

Defendants submitted the sworn declarations of Plaintiffs'
immediate supervisors: Lisa Schottroff (Supervisor of Medical
Case Management from 1999 through January 2006 at the Vinings
location and immediate supervisor of Plaintiffs Jones, Johnson,
and Upshaw) [Doc. 120-10], Karen Stevenson (Supervisor of Health
Services at the Buckhead location from 2003 through 2005 and
immediate supervisor of Plaintiffs Teren and Paisley) [Doc. 120-
9], and Lisa Harris (Supervisor of Case Management from
September 2003 through February 2005 at the Buckhead location
and direct supervisor of Plaintiff Brinson) [Doc. 120-11]. Each
of these supervisors stated that the Plaintiffs were required to
be RNs and have clinical experience in order to hold their
positions, and that they needed to use their nursing training to
understand and interpret clinical information, to determine when
to gather additional information, to determine whether treatment
was appropriate under the circumstances, to communicate with
physicians regarding a patient's situation, to communicate with
and educate patients, and to recognize abnormalities and
determine when complicating circumstances merited further
attention to a case.  Stevenson also declared that although
Plaintiffs Teren and Paisley did not have the discretion to deny
an approval without a physician's review, they did have
authority to deviate from the Guidelines and approve treatment
without the approval of a supervisor. [Doc. 120-9, at 4-5].
Schottroff declared that upon recognizing complicating factors
or abnormalities, Jones, Johnson and Upshaw "had complete
autonomy to modify the care plans using their clinical judgment
based on the circumstances.  It was not required to obtain

31

either my or a physician's approval to modify a plan." [Doc. 120-10].[20]  Finally, Piercy testified that depending on the plan, an NCM would have the authority to authorize services outside the Milliman Guidelines if the NCM determines that the service is medically necessary and the most cost-effective and appropriate treatment for the patient. [Piercy Dep. I, Doc. 115, at 91-92].

    6.    WellPoint's Classification of Plaintiffs as Exempt

    Friedman testified that he made the determination when he drafted the job descriptions for MMNs and NCMs that the NCM and MMN jobs should be classified as exempt under the administrative exemption.  [Friedman Dep. II, Doc. 97, at 9-12, 14; 40-41, 44]. He testified that he did not receive a legal opinion as to

_____

    [20]Plaintiffs filed a motion to strike the declarations of Stevenson, Harris, and Schottroff because their declarations conflict with Friedman's deposition testimony that WellPoint did not require an RN to fill the position of either MMN or NCM. [Doc. 138].  Friedman testified as a 30(b)(6) witness for WellPoint, but his testimony as to whether an RN was required to do the job of an NCM was offered as his own personal testimony, not on behalf of WellPoint. [Friedman Dep. II, Doc. 97, at 15].  In any case, it is clear from Friedman's deposition testimony that he did not have personal knowledge of what MMNs or NCMs did on a day-to-day basis, how much discretion they used in their job, or what training they needed for their jobs. [See, e.g., Friedman Dep. II, Doc. 97, at 37 ("I did not personally get into the nitty-gritty of their day-to-day work, just the overview of the job description itself"), 38].  Friedman testified that he does not know how to use the Milliman Guidelines or WMDS, and he is not a nurse.  [Friedman Dep. II, Doc. 97, at 17-18].  The Court, therefore, does not accept his testimony or the job descriptions as a factual description of what MMNs or NCMs were actually doing or whether an RN degree would be needed.

whether the positions should be exempt under the FLSA. He further testified that he did not know whether MMNs or NCMs were required to make medical decisions, nor was he sure whether the MMNs or NCMs had the authority to approve treatments that fell outside of the Milliman Guidelines. [Friedman Dep. II, Doc. 97, at 39-40, 47]. He also testified that in his personal interpretation of the job descriptions, the job descriptions do not require NCMs or MMNs to be RNs.[21] [Friedman Dep. II, Doc. 97, at 14-15]. Piercy testified, however, that in order to be an NCM, one must have an RN or be a social worker (however, Piercy was not familiar with any social workers holding the position of case manager, and thought that they may have been grandfathered into the position under a former policy). [Piercy Dep. I, Doc. 115, at 20, 24-25].

According to printouts of the computer system used by the human resources department at WellPoint, "PeopleSoft,"[22] WellPoint apparently classified all of the Plaintiffs as "exempt" employees while they worked as MMNs or NCMs under either the administrative exemption or the professional exemption of the FLSA. [Pl.'s Exs. 3, 4, 5, 6, 7, 8].

---

[21]Friedman testified as a 30(b)(6) witness for WellPoint, but his testimony as to whether an RN was required to do the job of a NCM was limited as his own personal testimony, not on behalf of WellPoint. [Friedman Dep. II, Doc. 97, at 15].

[22]PeopleSoft contains "job data" on employees that is entered by employees in the human resources department at WellPoint. [Giordano Dep. II, Doc. 103, at 35]. The information in PeopleSoft was not entered or maintained by the payroll department. [Giordano Dep. II, Doc. 103, at 35, 37, 40].

## 7.  Plaintiffs' Compensation

Plaintiffs do not dispute that the amount that they were paid each week did not vary based on the number of hours that they worked, and that the amounts of their paychecks did not vary with the exception of raises.  [Doc. 149, at 5-6; Brinson Dep. II, Doc. 129, at 108-109, 154; Johnson Dep. I, Doc. 122, at 159; Jones Dep., Doc. 131, at 36-37; Upshaw Dep. I, Doc. 124, at 38-39, 61; Paisley Dep. I, Doc. 123, at 89].  Further, five of the Plaintiffs testified that when they were paid by WellPoint, they were being paid a salary as opposed to being paid by the hour. [See Jones Dep., Doc. 131, at 35; Teren Dep., Doc. 130, at 25; Upshaw Dep. I, Doc. 124, at 38-39; Brinson Dep. II, Doc. 129, at 31-32]. Johnson specifically testified that she understood that she was being paid for all hours worked when she was paid by WellPoint. [Johnson Dep. I, Doc. 122, at 189]. There also appears to be no dispute that Plaintiffs each earned more than $455 per week.[23]  However, Defendants claim that

---

[23]Documents submitted by Plaintiffs showing Plaintiffs' W-2 information indicate that Plaintiffs earned the following amounts at WellPoint in the years 2003 through 2005:

1) Johnson earned $50,631.62 in 2003, $52,089.73 in 2004, and $35,770.91 in 2005 (Johnson worked through September 23, 2005);

2) Paisley earned $49,410.61 in 2003, $50,926.79 in 2004, and $12,836.90 in 2005 (Paisley worked through March 4, 2005);

3) Teren earned $40,670.02 in 2003, $45,592.63 in 2004, and $27,034.72 in 2005 (Teren worked through April 21, 2005);

4) Upshaw earned $47,741.08 in 2003, $50,633.97 in 2004, and

Plaintiffs received a "salary," while Plaintiffs claim that they were paid based on an hourly rate for 40 hours per week each week that they worked for WellPoint.

Plaintiffs submitted "payroll advice" forms ("paystubs") showing direct deposit payments to Plaintiffs Paisley, Upshaw, and Teren. [Pl.'s Exs. 1, 9, 10].[24] On these paystubs, there exists a notation for the number of hours designated as "Regular Time," "Paid Time Off," and "Holiday Pay." [See Pl.'s Exs. 1, 9, 10]. For each biweekly period, the hours noted on the paystubs total 80 hours. In addition, the paystubs include a "Pay Rate" followed by a dollar amount designated as "hourly." [Pl.'s Exs. 9, 10]. However, in October of 2004, WellPoint began noting on the paystubs an annual salary, rather than an

---

$43,421.44 in 2005 (Upshaw worked through November 4, 2005);

5) Jones earned $49,234.50 in 2003, $51,383.46 in 2004, and $46,482.03 in 2005 (Jones worked through November 18, 2005);

6) Brinson earned $56,740.49 in 2003, $49,230.30 in 2004, and $22,982.47 in 2005 (Brinson testified that she worked through April 21, 2005).

[Doc. 105-4, at 2-19]. Plaintiffs characterize these payments as "hourly." [Doc. 94-2, at 130-33]. Defendants maintain that Plaintiffs were paid a salary. [Doc. 120-2, at 6].

[24]Defendant objected that these documents have not been "authenticated with a record citation" in Plaintiffs' filings. [Doc. 166]. However, Plaintiffs cited to these exhibits in their filings and deposed WellPoint's 30(b)(6) witness Donna Giordano (WellPoint's payroll manager from November of 2005 through October 2006) regarding these documents. Finally, these exhibits have been filed with the Court as part of the record. [See Doc. 104].

hourly rate. [See Pl.'s Ex. 1]. The reason for this change is unclear. In addition, Plaintiffs submitted computer screen printouts from PeopleSoft regarding job data in connection with each of the Plaintiffs. [See Pl.'s Exs. 3-8]. Each of these screen printouts include the following notations with respect to Plaintiffs' positions: "Standard Hours: 40.00" and "1st Shift." [Pl.'s Exs. 3-8].

Several of the Plaintiffs testified that they would be required to make up work that they missed during the week, but their pay was not docked for missing work. [Jones Dep., Doc. 131, at 178; Teren, at 49; Paisley I, at 70]. Plaintiffs submitted an e-mail message dated April 5, 2004 from Lisa Harris, a supervisor, to various staff members, including Plaintiff Brinson. [Pl.'s Ex. 31]. Harris states the following: "If you are running late, call me on my cell and/or leave a message on my voicemail. Any time that will need to be made up should be done in the week of the occurrence." [Pl.'s Ex. 31]. Paisley testified that she was disciplined for attendance or tardiness while at WellPoint. [Paisley Dep. I, Doc. 123, at 37].

WellPoint's New Associate Handbook specifies that "Exempt associates ordinarily are not eligible for overtime pay. They are paid a predetermined amount each pay period regardless of the number of hours actually worked. Exempt associates are paid for accomplishing the responsibilities and duties assigned to them and not for the number of hours worked." [Def.'s Ex. 2].

B.    Procedural History

On October 11, 2006, Plaintiffs Johnson and Paisley filed this suit as a collective action against WellPoint, alleging

36

willful violation of the FLSA as well as claims under state law for conversion, intentional infliction of emotional distress, negligence, and attorneys' fees. [Doc. 1]. WellPoint filed an answer. [Doc. 3]. Plaintiffs then moved for class certification, which this Court denied in an order dated August 23, 2007. [Doc. 25]. On October 5, 2007, the Court granted Plaintiffs' motion to add Plaintiffs Teren, Uphsaw, Jones, and Brinson as parties to the action as of the dates each filed their consents to be Plaintiffs. [Doc. 27]. Teren was added as of December 8, 2006, Upshaw was added as of December 8, 2006, Jones was added as of December 14, 2006, and Brinson was added as of January 31, 2007. [Doc. 27].

On May 22, 2008, the Court granted Plaintiffs' motion to amend the Complaint [Doc. 76], and Plaintiffs filed the Amended Complaint that same day. [Doc. 77]. The Amended Complaint alleges that Defendants willfully violated the FLSA by asking Plaintiffs to work in excess of 40 hours per week without compensation and failing to keep records as required under the FLSA. [Doc. 77 ¶¶ 20-26]. Plaintiffs seek overtime pay, liquidated damages, attorneys' fees, and costs. [Doc. 77 ¶ 26]. In addition to their FLSA claim, Plaintiffs have brought state law claims for money had and received / unjust enrichment, intentional infliction of emotional distress, negligence with respect to the determination of whether Plaintiffs are exempt under the FLSA, punitive damages, and attorneys' fees. [Doc. 77 ¶¶ 27-40]. The state law claims of Plaintiffs Teren and Brinson have since been dismissed with prejudice pursuant to a consent motion filed by Plaintiffs. [Doc. 139].

Plaintiffs have filed a motion for partial summary judgment as to their claims that they are not exempt from the overtime protections of the FLSA and are entitled to overtime pay at a rate of 1.5 times their regular rate of pay, that WellPoint wilfully violated the FLSA, that the proper statute of limitation is three years, and that Plaintiffs are entitled to liquidated damages. [Doc. 94]. Defendants have filed a response in opposition to Plaintiff's motion. [Doc. 150]. Plaintiffs filed a reply brief [Doc. 168].

Defendants have filed a motion for summary judgment on all claims, including Plaintiffs' state law claims. [Doc. 120]. Plaintiffs have filed a response in opposition [Doc. 148], and Defendants have filed a reply brief. [Doc. 169].

II.  Standard of Review

The Court will grant summary judgment when "there is no genuine issue as to any material fact . . . and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). To be material, a fact must be identified by the controlling substantive law as an essential element of the non-moving party's case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Furthermore, the issue must be genuine;

summary judgment will not be granted if there is not "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Id. at 249. In reviewing the record, the district court must construe the facts and make all reasonable inferences in favor of the non-moving party. Id. at 255; Reese v. Herbert, 527 F.3d 1253, 1271 (11th Cir. 2008).

## III. Legal Analysis

### A. Claims Under the Fair Labor Standards Act

Congress enacted the FLSA to remedy "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." 29 U.S.C. § 201(a). Section 207 ensures that qualifying employees receive overtime benefits:

> No employer shall employ any of his employees who in any workweek is engaged in commerce . . . for a workweek longer than forty hours . . . unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

Id. § 207(a)(2)(c).

Exempt from this overtime benefits provision is "any employee employed in a bona fide executive, administrative, or professional capacity." Id. § 213(a)(1). Defendants "carr[y] the burden of proving the exemption, and [the Court] narrowly construe[s] the overtime provisions of Section 207 against [them]." Hogan v. Allstate Ins. Co., 361 F.3d 621, 625 (11th Cir. 2004); Atlanta Prof'l Firefighters Union, Local 134 v. Atlanta, 920 F.2d 800, 804 (11th Cir. 1991).

Plaintiffs argue that because this Court refused to grant WellPoint's motion for summary judgment in Morrow, Plaintiffs

should prevail against WellPoint as to both WellPoint's motion for summary judgment and Plaintiffs' motion for summary judgment. This Court in Morrow concluded that based on the evidence submitted by the parties in that case, there was a genuine issue of material fact as to the level of discretion and independent judgment exercised by the plaintiffs, and that granting summary judgment in favor of the defendants would be improper. Morrow, No. 1:04-CV-01774-ODE, slip op. (N.D. Ga. Sept. 1, 2006).

This Court's decision in Morrow does not automatically lead to the conclusion that the Plaintiffs in this case are entitled to prevail against WellPoint. Although the facts are very similar, the evidence in this case differs from the evidence in Morrow, as different plaintiffs are involved. The Court must therefore analyze the evidence to determine whether summary judgment in favor of any party is appropriate.

### 1. Professional Exemption

An employee is employed in a professional capacity if the employee is:

(1) Compensated on a salary or fee basis at a rate of not less than $ 455 per week . . .; and

(2) Whose primary duty is the performance of work:

(I) Requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction. . .

29 C.F.R. § 541.300.[25]

_____

[25] Defendants correctly note that on August 23, 2004, new regulations promulgated by the Department of Labor took effect.

a.   <u>Salary</u>

Plaintiffs do not dispute that they were paid greater than $455 per week, nor do they appear to dispute that they were paid a "salary," although they contend that they were forced to make up time missed during the week, which is inconsistent with having an "exempt" status.   The Department of Labor regulations provide in part:

> An employee will be considered to be paid on a "salary basis" within the meaning of these regulations if the employee regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed. Subject to the exceptions provided in paragraph (b) of this section, an exempt employee must receive the full salary for any week in which the employee performs any work without regard to the number of days or hours worked.

29 C.F.R. § 541.602(a).

The Court finds as a matter of law that Plaintiffs were paid on a salary basis.   Plaintiffs testified that their pay did not vary with the number of hours that they worked, and that they received the same amount of pay each pay period except when they received raises.   Although Plaintiffs argue that they were forced to make up time that they missed during the week or use "compensation time," they also testified that their pay was never reduced for such absences.   Nor have Plaintiffs presented any evidence that their pay was ever actually reduced for missing work or being tardy.   Therefore, the "salary basis" test

---

The new regulations do not materially change the elements of the professional exemption test, and there is no need to conduct a separate analysis under the old and the new regulations.   For ease, the Court will refer only to the new regulations.

is satisfied. See Auer v. Robbins, 519 U.S. 452, 461 (1997) (an employee's pay is not "subject to" deductions under the regulations unless there is an actual practice of deductions or an employment policy that creates a "significant likelihood" of such deductions); Atlanta Prof'l Firefighters Union, 920 F.2d 800, 805 (11th Cir. 1991) (employees were paid on a salary basis where they were paid a predetermined amount and there was no evidence that an employee had ever suffered a reduction in pay for tardiness or other disciplinary infraction).

b.   Work Requiring Advanced Knowledge

The regulations explain that:

> "The phrase 'work requiring knowledge of an advanced type' means work which is predominantly intellectual in character, and which includes work requiring the consistent exercise of discretion and judgment, as distinguished from performance of routine mental, manual, mechanical or physical work. An employee who performs work requiring advanced knowledge generally uses the advanced knowledge to analyze, interpret or make deductions from varying facts or circumstances.

Id. § 541.301(b).  It is undisputed that Plaintiffs were Registered Nurses.  According to the Code of Federal Regulations, Registered Nurses "generally meet the duties requirements for the learned professional exemption."  Id. § 541.301(e)(2).  However, in a case such as this, involving registered nurses who are not performing registered nurse duties, the Court must analyze whether the NCMs or MMNs consistently exercised discretion and judgment.

The Court finds that there is a genuine issue of material fact as to whether each of the Plaintiffs used their discretion and judgment as nurses in their day-to-day duties.  Each of the NCMs testified that they had little discretion in how they would

input information into WMDS, that they had no authority to override any of the outcomes in the Guidelines without first speaking with a WellPoint physician, and that they did not make any decisions of consequence. However, Plaintiffs' supervisors declare that Plaintiffs did have the authority to modify care plans when, based on their nursing judgment, they felt it necessary to do so. Their immediate supervisors declared that Plaintiffs were required to use their nursing judgment and knowledge to understand and communicate the clinical information on which approvals and denials were based. Furthermore, the Plaintiffs gave contradictory or ambiguous testimony as to whether they used their knowledge as nurses or discretion and judgment in their jobs. Although each Plaintiff testified that she did not need to be an RN to do her job, each Plaintiff also expressed some uncertainty as to how much medical knowledge would be needed to understand the clinical information they handled each day and use the Guidelines. Jones indicated during her testimony that her nursing training may have helped her identify comorbidities in medical records when she was completing retrospective reviews, although she later testified that she did not make any determinations as to whether there were comorbidities, and instead only relied on a physician's specific designation of comorbidities in the medical records. [Jones Dep., Doc. 131, at 46-47, 52 185, 187-88]. Although Plaintiffs characterize WMDS as a merely a "drop-down table," the Court's review of screen shots from a case management window in WMDS indicates that one would need to have, at the very least, substantial knowledge of medical terminology and some

medical training simply to maneuver WMDS and make the appropriate notations in the appropriate fields. [See Call Dep., Doc. 106, Exs. 9, 10].

In addition, although their authority to use their discretion was limited to some extent, Plaintiffs' testimony reflected that they were able to exercise some discretion and judgment in managing the care of their patients. Plaintiff Brinson, for instance, acknowledged that she sometimes advocated for patients when they needed an approval for a treatment or service, and that she would present clinical information verbally and discuss with WellPoint physicians whether patients were in an appropriate facility for treatment and when asked whether she would make a recommendation, she said "[m]aybe a suggestion." [Brinson Dep. II, Doc. 129, at 71]. Brinson also stated that she would give her opinion during grand rounds about whether a pending request for treatment should be approved or accommodated. [Brinson Dep. II, Doc. 129, at 113]. The regulations provide that "employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level... The decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action." 29 C.F.R. § 541.202(c).

Further, Jones testified that she would often identify community resources to help a patient where the patient needed services that were not covered by the plan or the patient was having other difficulties, and she would follow up with the patient to ensure that the patient's needs were being met.

[Jones Dep., Doc. 131, at 66, 68, 71-72, 74-76]. She also testified that she could modify the deadlines for goals in a care plan on a case-by-case basis depending on the patient, so long as she documented in the system why she was doing so. [Jones Dep., Doc. 131, at 182-83].

Upshaw also testified that she would call to follow up on patients occasionally to "see how they were doing," and if they had a need for a service or treatment, she would call a physician to see if he would order it. [Upshaw Dep. I, Doc. 124, at 85-86, 105-106, 123-25]. It is unclear whether Upshaw used her knowledge as an RN to make a determination that she should call a physician. Plaintiff Teren testified that she would make determinations regarding whether to send a case to case management, although she did not have the authority to make the final decision. [Teren Dep., Doc. 130, at 89-90].

Plaintiffs make much of the fact that Friedman interpreted the job descriptions for MMNs and NCMs as not requiring the employee to be an RN, and that the job descriptions themselves specify that education and experience equivalent to the requirements listed will suffice. However, the Court finds that Friedman was not testifying as a Rule 30(b)(6) witness when he made this statement, and testified that he did not have personal knowledge as to what Plaintiffs were actually doing or what kinds of medical decisions they had to make. In addition, the Court must look to an employee's actual work activities, rather than an employer's job description, to determine whether an employee falls into an exemption under the FLSA. See Schaefer v. Indiana Michigan Power Co., 358 F.3d 394, 400 (6th Cir.

2004); Vela v. City of Houston, 276 F.3d 659, 677 (5th Cir. 2001) ("a job description does not indicate whether each Manager exercised discretion and if he did, to what extent"); Cooke v. Gen. Dynamics Corp., 993 F. Supp. 56, 61 (D. Conn. 1997)("Whether an employee is exempt is determined by the employee's actual work activities, not by the employer's characterization of those activities through a job title or description").[26]  Finally, although the job descriptions state that "any combination of education/experience, which would provide an equivalent background" is allowed [see Def.'s Ex. 4, 9], this factor does not, in and of itself, defeat the professional exemption.  See 29 C.F.R. 541.301(d) ("...[T]he exemption is also available to employees in such professions who have substantially the same knowledge level and perform substantially the same work as the degreed employees, but who attained the advanced knowledge through a combination of work experience and intellectual instruction").

c.  Primary Duty

Furthermore, if Plaintiffs exercised discretion and judgment, there is a genuine issue of fact as to whether doing

---

[26]Plaintiffs also contend that Defendants employed Edna Snellings, who is not an RN, to conduct retrospective reviews.  In response, Defendants have filed a sworn declaration of Edna Snellings, in which she states that her position is Grievance and Appeal Coordinator, and that her job entails creating files for appeal reviews containing medical records and documentation and forwarding them to a physician for review.  She states that she has never held the position of NCM or MMN, nor are her job functions similar to those performed by NCMs and MMNs. [Doc. 150-3].

so was part of their "primary duty." See 29 C.F.R. § 541.700(b) (stating that, while not the sole test, "[t]he amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee.") Each Plaintiff testified that inputting clinical information into the computer was an important and time-consuming aspect of their job. Johnson testified that she spent 80% to 90% of her time inputting information into WMDS, that she was told by her supervisor that inputting data in a timely fashion was the most important aspect of her job, and that her evaluations were based on her timely input of this information. [Johnson Dep. I, Doc. 122, at 67, 70-71]. Plaintiffs' testimony regarding when they used their own discretion and judgment to help patients indicated that these tasks were minor compared to the amount of time they spent inputting clinical information into WMDS. If they were not required to use any discretion or judgment in inputting this information, but instead merely typed what providers told them, then it is possible that Plaintiffs do not meet the "primary duty" test for exemption. Because it is unclear how much of their nursing knowledge and judgment they used in the receipt and summarizing of clinical information and in the generation and customization of care plans, there is a genuine issue of fact as to whether Plaintiffs' primary duties involved the consistent use of discretion and judgment.

2. Administrative Exemption

An employee is employed in an administrative capacity if the employee is:

47

(1) Compensated on a salary or fee basis at a rate of not less than $ 455 per week . . .;

(2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and

(3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200.

For the reasons stated above, the Court finds that the first element of this test is satisfied. The Court also finds that, as a matter of law, Plaintiffs' "primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers." WellPoint's customers are employers who have purchased health insurance for their employees, and Plaintiffs' work is primarily the administration of these benefits to WellPoint's customers. The regulations provide that "Work directly related to management or general business operations includes, but is not limited to, work in functional areas such as... employee benefits." 29 C.F.R. § 541.201. Insurance claims adjusters are generally considered to perform work that directly related to the management or general business operations of either their employer or their employer's customers because their work covers the areas of insurance, safety and health, personnel management, human resources, and legal and regulatory compliance. See 29 C.F.R. § 541.203(a); Roe-Midgett v. CC Serv., Inc., 512 F.3d 865, 872 (7th Cir. 2008); Cheatham v. Allstate Ins. Co., 465 F.3d 578, 585 (5th

Cir. 2006); Opinion Letter, United States Dep't of Labor, FLSA2005-25 (Aug. 26, 2005). While Plaintiffs are not insurance claim adjusters, they are similar in that they administer employment benefits for WellPoint's customers. There is no evidence in the record that Plaintiffs produced insurance policies or sold them to customers. Therefore, their work is administrative in nature, and not related to the production aspects of the business. See 29 C.F.R. § 541.201(a).[27]

Finally, for the same reasons as stated with respect to the professional exemption, the Court finds that there is a genuine issue of material fact as to whether the third element of the test is satisfied. The United States Court of Appeals for the Eleventh Circuit has stated that the discretion and independent judgment referred to in the third element of the administrative

---

[27]Plaintiffs claim that WellPoint's "product" is case management and medical management services, which Plaintiffs were involved in producing. [Doc. 94-2, at 35]. Plaintiffs rely on two opinion letters issued by the Department of Labor ("DOL"), FLSA 2006-20NA (Sept. 8, 2006) and FLSA 2007-7 (Feb. 8, 2007). In both of those opinions, the relevant employees worked as case managers for companies in the business of providing services for individuals with disabilities. The DOL determined that the case managers, who were responsible for teaching and coordinating care and services for the disabled individuals, were not exempt under the administrative exemption because their primary duty was to provide the case management services that their employer was selling to its clients.
WellPoint's business is selling insurance coverage to its customers for the benefit of their employees, and Plaintiffs are involved in administering such health benefits to the employees of WellPoint's customers. The Court finds that Plaintiffs' work is therefore directly related to the management and general business operations of WellPoint's customers and is administrative, rather than production oriented.

exemption must be exercised "customarily and regularly." <u>Hogan</u>, 361 F.3d at 627. There is a triable issue as to whether Plaintiffs customarily and regularly exercised discretion and judgment. Likewise, Defendants' argument that Plaintiffs are exempt under a combination of the two exemptions, <u>see</u> 29 C.F.R. § 541.600, is unavailing.

B.    <u>Recordkeeping Violations</u>

The first claim of Plaintiffs' Amended Complaint contains an allegation that WellPoint violated the recordkeeping violations of the FLSA. Defendants have moved for summary judgment on the issue of whether they owe damages to Plaintiffs for violation of the recordkeeping violations of the FLSA. 29 U.S.C. § 211(c). To the extent that Plaintiffs seek damages based on this allegation, as distinct from the allegation that WellPoint violated the overtime provision of the FLSA, the Court grants Defendants' motion for summary judgment. There is no private right of action for recordkeeping violations under the FLSA, although it may be considered as a factor indicating a willful violation of the overtime provision. <u>Elwell v. Univ. Hosp. Home Care Serv.</u>, 276 F.3d 832, 844 (6th Cir. 2002); <u>Rossi v. Assoc. Limousine Serv., Inc.</u>, 438 F. Supp. 2d 1354, 1366 (S.D. Fla. 2006).

C.    <u>Willfulness</u>

If a defendant willfully violates the overtime compensation provision of the FLSA, a three-year statute of limitations for which period back wages may be sought is triggered, as opposed to the two-year limitations period that normally applies. 29 U.S.C. § 255(a). A finding of willfulness may also entitle

plaintiffs to an award of liquidated damages. 29 U.S.C. §

216(b). As there exists a genuine issue of material fact as to

whether plaintiffs fell within the professional or

administrative exemptions, the Court has not determined that

WellPoint is liable for overtime pay. A finding of a willful

violation must be predicated on a finding of a violation of the

overtime provision. See Cooke v. Gen. Dynamics Corp., 993 F.

Supp. 56, 65 (D. Conn. 1997). Therefore, the Court DENIES both

Plaintiffs' and Defendants' motions for summary judgment as to

the willfulness of any violation that may have occurred.

D.    Fluctuating Workweek

In their motion for summary judgment, Defendants argue that

if they are found liable for overtime, they are entitled to pay

overtime calculated under the "fluctuating workweek method,"

which allows an employee whose hours fluctuate from week to week

to be compensated at a fixed amount per week as straight-time

pay irrespective of the number of hours worked. Payment for

overtime hours under this method is at one-half times the

employee's regular rate of pay instead of the standard one and

one-half time rate because the straight-time rate already

includes compensation for all hours worked. 29 C.F.R. § 778.114

(a). This method is appropriate only if "(1) the employee

clearly understands that the straight-salary covers whatever

hours he or she is required to work; (2) the straight-salary is

paid irrespective of whether the workweek is one in which a full

schedule of hours are worked; (3) the straight-salary is

sufficient to provide a pay-rate not less than the applicable

minimum wage rate for every hour worked in those workweeks in

which the number of hours worked is greatest; and (4) in addition to straight-salary, the employee is paid for all hours in excess of the statutory maximum at a rate not less than one-half the regular rate of pay." Davis v. Friendly Exp., Inc., No. 02-14111, 2003 WL 21488682, at *1 (11th Cir. Feb. 6, 2003)(unpublished opinion).

Because the Court cannot conclude, on the basis of the evidence, that Defendants owe overtime payments to Plaintiffs, it would be premature at this time to determine the method by which such overtime payments should be calculated. Defendants' motion for summary judgment as to this issue is therefore DENIED.

E.    State Law Claims

Defendants have moved for summary judgment on the state law claims brought by Plaintiffs Johnson, Jones, Paisley and Upshaw. For the reasons stated below, the Court GRANTS the Defendants' motion for summary judgment on all state law claims.

1.    Intentional Infliction of Emotional Distress

Plaintiffs have testified that their claim for intentional infliction of emotional distress is based on their having to work long hours without being paid overtime wages. [Upshaw Dep., Doc. 124, at 157; Johnson Dep. I, Doc. 122, at 169; Paisley Dep. I, Doc. 123, at 97-101; Jones Dep., Doc. 131, at 138-141]. In Georgia, the elements of a claim for intentional infliction of emotional distress are as follows: (1) the conduct must be intentional or reckless, (2) the conduct must be extreme and outrageous, (3) there must be a causal connection between the wrongful conduct and the emotional distress, and (4) the

emotional distress must be severe. <u>Walker v. Walker</u>, 668 S.E.2d 330, 335 (Ga. Ct. App. 2008). The Georgia Court of Appeals has granted summary judgment in favor of an employer on an intentional infliction of emotional distress claim where the employee alleged that he was forced to work long hours and to complete stressful tasks. <u>Norfolk Southern Railway Co. v. Spence</u>, 435 S.E.2d 680, 681-82 (Ga. Ct. App. 1993). "However oppressive this regimen may have been to plaintiff Spence, this was not that level of egregious or outrageous behavior which 'justifiably results in that severe fright, humiliation, embarrassment, or outrage which no reasonable person is expected to endure.'" <u>Id.</u> (quoting <u>Kornegay v. Mandy</u>, 379 S.E.2d 14, 16 (Ga. Ct. App. 1989)).

Given the above precedent, and taking all evidence in a light most favorable to Plaintiffs, the Court finds that the evidence that Plaintiffs were required to work long hours is not sufficiently "outrageous" or "extreme" to establish liability for intentional infliction of emotional distress. The Court therefore GRANTS Defendants' motion for summary judgment as to Plaintiff's intentional infliction of emotional distress claim.

2.    <u>Money Had and Received; Negligence</u>

Defendants have also moved for summary judgment as to Plaintiffs' state law claims of money had and received / unjust enrichment[28] and negligence. With respect to their money had

---

[28]"An action for money had and received 'lies where another has received money which the plaintiff, ex aequo et bono, is entitled to recover and which the defendant is not entitled in good conscience to retain.'" <u>William N. Robbins, P.C. v. Burns</u>,

and received / unjust enrichment claim, Plaintiffs seek damages "in an amount to be proven at trial for all time periods not covered by any recovery under FLSA for unpaid overtime wages." [Doc. 77, at 9]. With respect to their negligence claim, Plaintiffs seek "an amount to be determined at trial for which [Defendants] are liable." [Doc. 77, at 11]. Because the Court finds that the FLSA preempts these state law claims, Defendants' motion for summary judgment as to these two state law claims is GRANTED.

Plaintiffs have conceded that their claim for negligence is based on their allegation that Defendants negligently failed to classify them as non-exempt employees under the FLSA, and their claim for money had and received is predicated on their allegation that Defendants misclassified Plaintiffs and failed to pay Plaintiffs proper overtime wages. [Brinson Dep. II, Doc. 129, at 167-68; Jones Dep., Doc. 131, at 180]. They further argue, with respect to their money had and received claim, that WellPoint violated an implied contract with Plaintiffs whereby Plaintiffs would only work 40 hours a week for their salary. [Doc. 148, at 40-42].

Where a state law claim depends on the finding of a violation of the FLSA and requires the same proof as is required to prove a violation of the FLSA, and the state law claim is only invoked to expand a plaintiff's remedies, the state law claim is preempted by the FLSA. Anderson v. Sara Lee Corp., 508 F.3d 181, 194 (4th Cir. 2007). In Anderson, the Fourth Circuit

_____

488 S.E.2d 760, 763 (Ga. Ct. App. 1997).

held that negligence, contract, and fraud claims were precluded by conflict preemption[29] because they duplicated FLSA claims and were invoked merely as a source of additional remedies for FLSA violations. Id. at 193-94. The court found that because the FLSA does not authorize states to create alternative remedies for FLSA violations, and because it also found that Congress prescribed exclusive remedies in the FLSA for violations of its mandates, the state law claims were precluded. Id. at 193-94.

Plaintiffs rely on the Eleventh Circuit opinion in Avery v. City of Talladega, Alabama, 24 F.3d 1337 (11th Cir. 1994), to argue that their state law claims are not preempted. Avery, however, is not on point, as it only addressed the question as to whether a state law contract claim would be preempted where the contract explicitly provided that employees would be paid overtime in accordance with the FLSA. Id. at 1348. Here, Plaintiffs allege no claims based on the violation of an express provision of a contract. Instead, their claims rest on their allegations that WellPoint violated the FLSA in violation of an "implied contract" with Plaintiffs whereby Plaintiffs would work only 40 hours per week for their salary. The Court notes that during the depositions of Jones, Plaintiffs' counsel stipulated that Plaintiffs' money had and received claim is based on the fact that they were not paid overtime to which they were

---

[29]There are three ways in which federal law may preempt state law under the Supremacy Clause: "express preemption," "field preemption," or "conflict preemption," which occurs when a state law actually conflicts with a federal law. Anderson, 508 at 191.

entitled under the FLSA: "We have stipulated that the plaintiffs' claims for money had and received / [unjust enrichment] and negligence are predicated <u>solely</u> on the allegation that defendant improperly classified them as exempt employees and failed to pay them overtime to which they allege they were entitled." [Jones Dep., Doc. 131, at 180 (emphasis added); <u>see also</u> Brinson Dep. II, Doc. 129, at 167-68].[30]

Courts in the Eleventh Circuit have held that claims whereby plaintiffs merely "recast" their FLSA claims are preempted by the FLSA. <u>See</u> <u>Alexander v. Vesta Ins. Grp., Inc.</u>, 147 F. Supp. 2d 1223, 1240-41 (N.D. Ala. 2001) (holding that the FLSA preempts plaintiffs' fraud claim, based on defendants' alleged mispresentations that they were exempt from the FLSA, because plaintiffs were merely recasting their FLSA claims as state law claims in order to obtain additional damages); <u>Tombrello v. USX Corp.</u>, 763 F. Supp. 541, 545 (N.D. Ala. 1991) (holding that the FLSA preempts the plaintiff's state claim for work and labor done: "As a matter of law, plaintiff cannot circumvent the exclusive remedy prescribed by Congress by asserting equivalent state law claims in addition to the FLSA claim"). The Court finds these cases persuasive here.

For the reasons stated above, the Court GRANTS the Defendants' motion for summary judgment as to Plaintiffs' state

---

[30]Plaintiffs also cite <u>Williamson v. Gen. Dynamics Corp.</u>, 208 F.3d 1144 (9th Cir. 2000). However, in that case, the Ninth Circuit concluded that common law fraud claims were not preempted by the anti-retaliation provision in the FLSA because that provision did not apply to the plaintiffs. <u>Id.</u> at 1152-53. Therefore, <u>Williamson</u> does not resolve the issue here.

law claims for money hand and received / unjust enrichment, negligence, as well as their demand for punitive damages and attorneys' fees based on these state law claims.[31]

IV.  Conclusion

The Court has carefully considered the parties' filings. In summary, Plaintiffs' motion for partial summary judgment is DENIED. [Doc. 94].  Defendants' motion for summary judgment is GRANTED with respect to Plaintiffs' state law claims (Counts II, III, IV, and V) and DENIED with respect to Plaintiffs' claim for overtime under the Fair Labor Standards Act (Count I). [Doc. 120].  Defendants' motion is GRANTED, however, with respect to any claim the Plaintiffs make with regard to Defendants' violations of the recordkeeping requirements of the FLSA. [Doc. 120].  Plaintiffs' motion for permission to respond to Defendants' objections to Plaintiffs' statement of material facts is GRANTED. [Doc. 172].

The parties are directed to file a Proposed Consolidated Pretrial order within thirty (30) days of the date of entry of this Order.

SO ORDERED, this _30_ day of March, 2009.

ORINDA D. EVANS
UNITED STATES DISTRICT JUDGE

[31]Plaintiffs have pleaded their demands for punitive damages and attorneys' fees separately as Counts IV and V, but their demand for these damages appears to be predicated on their substantive state law claims. [Doc. 77, at 11-12].